# EXHIBIT 1

David B. Rosenbaum, No. 009819
Joseph N. Roth, No. 025725
Phillip W. Londen, No. 032488
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012-2793
(602) 640-9000
drosenbaum@omlaw.com
jroth@omlaw.com
plonden@omlaw.com

Bryce K. Kunimoto (*pro hac vice to be submitted*)
Robert J. Cassity (*pro hac vice to be submitted*)
HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, Nevada 89134
(702) 222-2603
bkunimoto@hollandhart.com
bcassity@hollandhart.com

Attorneys for Plaintiff Sprout Financial, LLC

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Sprout Financial, LLC, a Delaware limited liability company, | No. CV 2019-011501 |
| Plaintiff, | **COMPLAINT** |
| vs. | **Eligible for Commercial Court** |
| CapFund Enterprises, Inc., d/b/a CapFund Financial, a Delaware corporation; Funded, LLC, a Nevada limited liability company; and Brian Sciara and Jennifer Sciara, Nevada residents and a married couple, | |
| Defendants. | |

Plaintiff Sprout Financial, LLC ("Sprout") states the following Complaint against Defendants CapFund Enterprises, Inc., d/b/a CapFund Financial ("CapFund"), Funded, LLC, Brian Sciara ("Sciara"), and Jennifer Sciara (together with Brian Sciara, "Sciaras").

**INTRODUCTION**

1. Stephen Campbell ("Campbell") and Micah Kinsler ("Kinsler") formed MiCamp Solutions, LLC ("MiCamp Solutions") in 2007 to provide credit card payment processing services for merchants. Campbell and Kinsler each owned 50% of the membership interests in MiCamp Solutions.

2. Sciara is the sole owner of CapFund, a credit card stacking business. Credit card stacking is a process whereby a broker helps individuals obtain unsecured lines of credit by simultaneously applying for several unsecured credit cards. CapFund collects a percentage of the total amount of credit it obtains for its customers.

3. In 2014, Sciara approached Campbell with an offer to sell CapFund to MiCamp Solutions. Instead, Campbell proposed that Sciara train MiCamp Solutions' employees on credit card stacking. In exchange, Campbell offered Sciara either compensation or equity in a new "sprout" business yet to be formed and operated under MiCamp Holdings, LLC ("MiCamp Holdings"), an Arizona limited liability company. At the time, Campbell and Kinsler each owned 50% of MiCamp Holdings. Sciara began providing intermittent assistance to develop the new "sprout" business. Sciara also received a commission for customer leads that he generated on behalf of MiCamp Solutions.

4. Over the next several years, Campbell made multiple efforts to come to a written agreement with Sciara regarding ownership interests in the developing "sprout" business. Each time, Sciara refused the terms of Campbell's offer. Oral discussions between Campbell and Sciara likewise failed. Sciara repeatedly rejected Campbell's proposed terms.

5. In March 2016, Campbell and Kinsler formally registered a Delaware entity called MiPoint LLC ("MiPoint"), which was wholly owned by MiCamp Holdings. They later changed the name from MiPoint to Sprout Financial, LLC in May 2016. MiCamp Holdings continued to be the sole member of the entity now called Sprout Financial, LLC ("Sprout"). As the sole owners of MiCamp Holdings, Campbell and Kinsler were also

2

the sole owners of Sprout, with each holding a 50% share.

6.      Between 2016 and 2018, Campbell continued his efforts to negotiate the terms of an agreement with Sciara regarding Sprout.  From July to October 2016, Sciara made several oral representations to Campbell and Sprout while meeting with Campbell in Phoenix, Arizona or during telephone conversations with Campbell that CapFund was generating over $100,000 in *net income* per month.  Relying upon Sciara's oral representations to Campbell, Sprout agreed to pay Sciara $30,000 per month and provide back-end processing for all of CapFund's sales in exchange for all of CapFund's revenues.  However, CapFund's *net income* was much less than $100,000 per month.  In fact, CapFund's *gross sales revenue* eclipsed $100,000 in only one month during the third quarter of 2016.  Given that Sciara was the sole owner of CapFund and had full access to CapFund's financial records, Sciara knew his oral representations to Campbell related to CapFund's *net income* were false.

7.      On or about March 31, 2018, Campbell and Kinsler executed an Asset Purchase Agreement whereby Kinsler would sell his share of MiCamp Holdings' membership interest in Sprout, as well as his share of Sprout's business assets owned and developed under MiCamp Holdings, to Campbell in his individual capacity in exchange for $500,000.00.  Following the Asset Purchase Agreement, Campbell owned 100% of the membership interests of Sprout, as well as all assets and liabilities of Sprout's business.

8.      Around this time, Campbell became concerned about Sciara's and CapFund's business practices.  A CapFund customer had filed a lawsuit against Sciara and CapFund in early 2018 alleging that they were engaged in risky and deceptive acts.  Campbell grew increasingly concerned that Sciara's and CapFund's business practices would put Sprout and him at risk.  Therefore, on August 23, 2018, Campbell paid $25,000 (exclusive of transaction fees) to settle the lawsuit on behalf of Sciara and CapFund.

9.      Seeking to disassociate from Sciara and CapFund, on August 31, 2018, Campbell offered to pay Sciara an additional $50,000 per month for four months

3

($200,000 total) for Sciara to end his association with Sprout. Sciara declined this offer.

10. Since then, despite claiming an ownership interest in Sprout, Sciara has colluded with current and former Sprout employees, referral partners, lead sources, and affiliates to steal leads and clients from Sprout and redirect them to CapFund.

## PARTIES, JURISDICTION, AND VENUE

11. Sprout is a Delaware limited liability company with its principal place of business in Phoenix, Arizona.

12. Campbell is a resident of Phoenix, Arizona, and is the sole member of Sprout.

13. CapFund is a Delaware corporation with its principal place of business in Las Vegas, Nevada.

14. Funded, LLC, is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.

15. Sciara is a resident of Las Vegas, Nevada, and is the sole owner of CapFund and sole member of Funded, LLC.

16. Jennifer Sciara is a resident of Las Vegas, Nevada, and is the spouse of Brian Sciara. All actions taken by Brian Sciara alleged in this complaint were done for the benefit of the marital community. Jennifer Sciara is being sued as a defendant in this action because of Nevada and Arizona law regarding community property. At all relevant times, Jennifer Sciara benefited from Sciara's actions on behalf of the community.

17. This Court has jurisdiction over this action pursuant to Article VI, § 14 of the Arizona Constitution, as well as A.R.S. §§ 12-123 and 12-1831.

18. Venue is proper in Maricopa County pursuant to A.R.S. § 12-401.

## GENERAL ALLEGATIONS

19. Sprout is a premier funding services provider that obtains financing and capital for its customers, which include both individuals and businesses. Sprout relies heavily on its referral partners for leads to develop and attract clients. Sprout's client

contacts and client relationships are among its most valuable assets.

20. Campbell started the Sprout business in 2014.

21. When Campbell's concept for Sprout's business arose in 2014, he, Kinsler, and Sciara had discussions about ownership distribution. They discussed a potential arrangement whereby Sciara could own 20% of Sprout—and Campbell and Kinsler would each own 40% shares—or Sciara could receive payments in exchange for provided certain services to Sprout.

22. In October 2014, Campbell sent Sciara a proposed agreement in an attempt to finalize the terms of an arrangement regarding Sprout ownership. Sciara rejected the agreement as "one-sided" and vaguely demanded more protection. Kinsler proposed that Sciara redline the agreement for him and Campbell to review, but Sciara did not do so. Sciara thus rejected Campbell's proposed terms but offered no alternative terms that would be acceptable to him.

23. In December 2015, the Chief Financial Officer ("CFO") for MiCamp Solutions was working on setting up a Delaware limited liability company that would later become Sprout. Despite not having a written agreement in place, Campbell, in good faith, instructed MiCamp Solutions' CFO that ownership of the Sprout business would be 80% MiCamp Holdings (jointly owned by Campbell and Kinsler, and thus Campbell and Kinsler would each own 40% of Sprout) and 20% CapFund (owned by Sciara).

24. However, because Sciara repeatedly refused to formalize the terms of joint ownership in Sprout, Campbell formed Sprout as a Delaware entity in 2016 with MiCamp Holdings as the sole member. Campbell initially registered Sprout on March 9, 2016, under the name MiPoint LLC, but subsequently changed the name to Sprout Financial, LLC on May 20, 2016. MiCamp Holdings remained the sole member of Sprout. At the time, Campbell and Kinsler each owned 50% of MiCamp Holdings.

**SCIARA FRAUDULENTLY INDUCES SPROUT INTO AGREEMENT**

25. On a number of occasions between July 2016 until October 2016, Sciara met with Campbell in Phoenix, Arizona, at Sprout's headquarters and had telephone

5

conversations with Campbell to discuss an arrangement where Sprout would provide customer service and transaction processing on behalf of CapFund and would pay Sciara a monthly fee in exchange for Sprout receiving all of CapFund's revenues.

26. During these in-person meetings at Sprout headquarters and over the phone, Sciara orally represented to Campbell repeatedly that CapFund's *net income* per month by the second quarter of 2016 exceeded $100,000.

27. Russell Hibbert, Sprout's former Senior Vice President of Business Development, was present for several of the conversations where Sciara represented that CapFund had a monthly "net income" exceeding $100,000.

28. Unbeknownst to Sprout, these representations were false as CapFund's *gross monthly sales revenue* from that time period only exceeded $100,000 one time in July 2016.

29. Sciara, as the sole owner of CapFund with full access to CapFund's financial books and records, knew the representations he made to Campbell were false when he made these representations.

30. Sciara made these misrepresentations to Campbell in order to induce him into having Sprout employees handle CapFund's day-to-day operations while paying Sciara an inflated monthly fee.

31. During the in-person meetings and telephone calls described above, Sciara represented to Campbell that, although he was "netting" over $100,000 per month from CapFund, he "could live with" personally receiving $30,000 per month from Sprout as well as having Sprout perform customer service and processing for all of CapFund's clients in exchange for allowing Sprout to realize all of CapFund's revenues.

32. Sciara's misrepresentations as to CapFund's monthly "net income" made this $30,000 monthly payment to Sciara seem reasonable because, if CapFund was in fact making over $100,000 in net income per month, Sprout would realize *at least* $70,000 in net gain (before internal costs and expenses for processing CapFund's transactions) per month from the deal.

6

33. After Sprout began performing all of CapFund's processing and providing customer support on or about October 2016, Sprout paid Sciara approximately $30,000 per month in exchange for Sprout receiving all of CapFund's revenues.

34. Sciara continued receiving payments from Sprout through August 2018.

35. Sprout based its decisions to engage Sciara, set Sciara's compensation, and facilitate CapFund's business through Sprout on Sciara's material misrepresentations about CapFund's monthly net income.

36. Sciara's misrepresentation of CapFund's financial success induced Sprout to believe that CapFund and Sciara would add significant value to Sprout's business.

37. Sprout reasonably relied upon Sciara's misrepresentations about CapFund's monthly *net income* to its detriment by using its employees and technology to perform virtually all of the services required to fulfill transactions for CapFund's clients and paying Sciara $30,000 per month from October 2016 until August 2018.

38. CapFund's average monthly *gross revenue* from January 2017 until August 2018 never reached or exceeded $100,000. CapFund's monthly *net income* was substantially lower than $100,000 during this time period.

**SCIARA NEVER HAD AND DOES NOT CURRENTLY HAVE AN OWNERSHIP INTEREST IN SPROUT**

39. Sciara presented Sprout as Campbell's company in his representations to third parties. Sciara knew that he did not have any ownership or equity interest in Sprout.

40. Campbell sometimes referred to Sciara as his "partner" in communications with third parties in the colloquial manner given that they were working together. However, this was not intended to convey that Sciara had an ownership interest in Sprout, as Sciara knew and understood. At no time did Campbell ever hold Sciara out as having an ownership interest in Sprout.

41. Sciara had no signatory authority on behalf of Sprout.

42. Sciara was never listed as a director, officer, manager, or member of Sprout in any fully executed or effective entity formation or governance documents.

7

43. Campbell and Kinsler executed an Asset Purchase Agreement effective March 31, 2018.

44. The Asset Purchase Agreement proceeded in two steps. First, Campbell and Kinsler—who each held 50% of MiCamp Holdings—distributed their share of MiCamp Holdings' membership interest in Sprout and Sprout's assets to Campbell and Kinsler, as individuals. Second, Kinsler sold his interest in Sprout and Sprout's assets to Campbell. Thus, as of March 31, 2018, Campbell was the sole member and owner of Sprout.

45. In August 2018, Sciara attempted to dissolve CapFund. However, the dissolution and withdrawal documents were rejected because CapFund was not current in its paperwork in Delaware, its state of incorporation, nor in Nevada, where it was qualified to do business.

46. Sciara has continued to operate CapFund and other businesses in the financial technology and small business funding section since August 2018.

## SCIARA'S AND CAPFUND'S QUESTIONABLE BUSINESS PRACTICES

47. In early 2017, an Internet website, the Ripoff Report, published online commentary that negatively depicted Sciara's and CapFund's business practices. As a result of this negative publicity, at least one potential lead source grew concerned with Sciara's and CapFund's business practices and decided against conducting business with both CapFund and Sprout, given Sciara's relationship with Sprout.

48. In and around December 2017, one of CapFund's customers sought to cancel their contract with CapFund. The customer claimed that CapFund had taken certain actions on his behalf that he had not authorized. CapFund agreed to release the customer from his contract in exchange for the customer's release of claims against CapFund and its affiliates, including Sprout. Sprout paid the attorney's fees CapFund incurred to negotiate this settlement.

49. On January 10, 2018, another of CapFund's customers filed a complaint in federal court against CapFund, Sciara, and other third parties, alleging that, among other

8

things, CapFund and Sciara fraudulently induced the customer to retain CapFund's services.

50. Because of Sciara's questionable business practices, Campbell became concerned that both Sprout and he would be put at risk. In addition, Campbell became concerned that the federal lawsuit would negatively impact not only CapFund's and Sciara's reputation, but Sprout's reputation as well. Accordingly, Campbell, as Sprout's owner, worked closely with CapFund, Sciara, and counsel on a defense strategy.

51. On August 8, 2018, Sciara and CapFund entered into a settlement agreement with the CapFund customer. Campbell paid $25,000 (exclusive of transaction fees) to settle the federal lawsuit on Sciara's and CapFund's behalf. Sprout also paid the attorney's fees CapFund incurred as a result of the lawsuit.

52. Sprout decided to disassociate from Sciara and CapFund. At this point, it was clear that Sciara and CapFund were engaged in risky, questionable business practices. Sprout did not want its reputation or business to be further impacted by continuing to associate with Sciara and CapFund.

**SCIARA, CAPFUND, AND SCIARA'S NEW BUSINESS ENTITY, FUNDED, LLC, STEAL BUSINESS FROM CAMPBELL AND SPROUT**

53. Beginning in the summer of 2018 and continuing through the present, Sciara conspired with current and former Sprout employees and contractors under exclusive agreements with Sprout to steal leads, clients, and exclusive referral partners from Sprout and redirect them to CapFund and Sciara's other business ventures, including an entity he formed on or about September 2018 called Funded, LLC, a Nevada limited liability company.

54. Sciara instructed current and former Sprout employees to provide him, CapFund, and/or Funded, LLC with Sprout's proprietary information—including client names, contact information, and financial information—taken from Sprout's customer relationship management system. Sprout did not authorize these actions. Sciara used this information to sell CapFund's and/or Funded, LLC's services to the customers that once

9

Case 2:13-cv-09226-SPL Document 1-3 Filed 09/19/15 Page 24 of 17

belonged to Sprout.

55.     Sciara successfully encouraged Sprout's referral partners and contractors, including Freedom Management, NCDC, LLC, Ripe Funding, MMJ Business Solutions, Atlas Business Capital, Spectrum REI, Frank Michela, and Michael Graham, among others, to breach their exclusive referral agreements with Sprout and refer leads to CapFund and Funded, LLC.

56.     Sciara approached existing Sprout clients and offered them lower fees. In doing so, Sciara purposely misled clients about the relationship between Sprout and CapFund and/or Funded, LLC. Sciara instructed Sprout clients to provide their information directly to Sciara, thus enabling Sciara, CapFund, or Funded, LLC to steal these clients from Sprout.

57.     Sciara misrepresented to third parties that Sprout was CapFund's parent company, thus deceiving third parties into transacting with CapFund rather than Sprout.

58.     Sciara's deceptive acts resulted in financial gain for the Sciaras personally, CapFund, and/or Funded, LLC at the expense of lost clients, client relationships, referral relationships, and revenue for Sprout and Campbell.

59.     Sciara used the proprietary information that he stole from Sprout, as well as Sprout's referral relationships, to benefit the other entities that Sciara formed, including Funded, LLC. Sciara's actions resulted in financial and reputational harm to Sprout and Campbell in the form of lost clients and lost revenue.

## CLAIMS FOR RELIEF

### Count I

### Tortious Interference with Business Relationships Against All Defendants

60.     Sprout incorporates the preceding paragraphs as if set forth here in full.

61.     Sprout had contractual relationships with its referral partners that required them to refer leads and clients exclusively to Sprout.

62.     As a result of these contractual relationships, Sprout expected to be the sole

10

recipient of leads and clients from its referral partners.

63. Sprout expected to acquire new clients and retain existing clients as a result of its contractual relationships with its referral partners.

64. Sprout expected its employees to protect Sprout's proprietary information, including client names, contact information, and financial data.

65. Sciara, CapFund, and Funded, LLC knew that Sprout had exclusive referral arrangements with its referral partners, and that Sprout expected its employees to protect and not divulge Sprout's proprietary information.

66. Sciara, CapFund, and Funded, LLC intentionally interfered with Sprout's business relationships by instructing Sprout's employees and contractors to provide them with Sprout's proprietary client information, by encouraging Sprout's referral partners to breach their exclusive referral agreements with Sprout and refer leads to CapFund or Funded, LLC instead, and by directly approaching Sprout's clients and misleading them about CapFund's or Funded, LLC's relationship with Sprout.

67. As a result of Sciara's, CapFund's, and Funded, LLC's intentional interference with its business relationships, Sprout lost leads, existing clients, and revenue.

## Count II

### Civil Fraud Against the Sciaras and CapFund

68. Sprout incorporates the preceding paragraphs as if set forth here in full.

69. CapFund, through Sciara, made material false representations—namely, that it was generating over $100,000 per month in *net income* during the second quarter of 2016.

70. CapFund, through Sciara, made these material false representations on several occasions from July 2016 to October 2016.

71. CapFund, through Sciara, made these material false representations orally to Campbell and in the presence of Russell Hibbert while visiting Sprout's headquarters in Phoenix, Arizona, as well as during telephone conversations with Campbell.

11

72. CapFund and Sciara knew that these representations were false because CapFund was generating only about $100,000 per month in gross sales revenue. CapFund, through Sciara, made these misrepresentations with the intent of inducing Campbell to have Sprout employees process all of CapFund's funding transactions and pay Sciara personally $30,000 per month in exchange for Sprout receiving all of CapFund's revenues.

73. Sciara made these misrepresentations with the intent to benefit his marital community with his spouse, Jennifer Sciara.

74. Jennifer Sciara benefited from Sciara's misrepresentations.

75. Sprout did not, and could not, know CapFund's true financial performance and relied on CapFund's and Sciara's misrepresentations in its decision to pay Sciara approximately $30,000 per month and process CapFund's business through Sprout in exchange for receiving all of CapFund's revenues from 2016 to 2018.

76. Sprout suffered financial injury as a result of these misrepresentations made by CapFund and Sciara in an amount to be proven at trial.

### Count III

### Fraud in the Inducement Against the Sciaras and CapFund

77. Sprout incorporates the preceding paragraphs as if set forth here in full.

78. Sciara personally and on behalf of CapFund made material misrepresentations to Sprout and Campbell over the course of August and September 2016 when he informed Sprout that CapFund was generating over $100,000 per month in "net income."

79. CapFund, through Sciara, made these material misrepresentations on several occasions from July 2016 to October 2016.

80. CapFund, through Sciara, made these material misrepresentations to Campbell, at the time Sprout's 50% owner and Chief Executive Offer, and in the presence of Russell Hibbert, at the time Sprout's Senior Vice President of Business Development, orally during visits to Sprout's headquarters in Phoenix, Arizona, and during telephone

12

conversations with Campbell.

81. Sciara had knowledge or belief that these representations as to CapFund's net income were false because he had full access to CapFund's financials and was aware of the true financial performance of the company.

82. CapFund and Sciara made these material misrepresentations with the intention of inducing Sprout to pay Sciara a $30,000 monthly fee and to process all of CapFund's business.

83. Sciara made these misrepresentations with the intent to benefit his marital community with his spouse, Jennifer Sciara.

84. Jennifer Sciara benefited from Sciara's misrepresentations.

85. Sprout relied upon CapFund's and Sciara's material misrepresentations by entering into an agreement to pay Sciara $30,000 per month and process all of CapFund's transactions in exchange for receiving all of CapFund's revenues.

86. Sprout lacked knowledge of CapFund's monthly net income when CapFund and Sciara made these material misrepresentations to induce Sprout into this arrangement.

87. Moreover, given the nature of their prior business dealings, Campbell trusted and relied upon Sciara's misrepresentations on behalf of CapFund as to CapFund's monthly net income.

88. As a direct and proximate result of CapFund's and Sciara's misrepresentations, Sprout has been damaged in an amount to be proven at trial.

**Count IV**

**Declaratory Relief Against Brian Sciara and CapFund**

89. Sprout incorporates the preceding paragraphs as if set forth here in full.

90. An actual and present controversy has arisen and now exists between the parties.

91. Sciara and CapFund have interfered with its business relationships, specifically, its exclusive referral contracts with referral partners and its relationships with potential and existing clients.

13

92.     Neither Sciara nor CapFund have any ownership interest in Sprout. Sprout was incorporated with MiCamp Holdings as its sole member. MiCamp Holdings was jointly owned by Campbell and Kinsler. When the Asset Purchase Agreement between Campbell and Kinsler was executed effective March 31, 2018, Campbell became the sole owner of Sprout. Sciara rejected each of Campbell's efforts to establish terms of joint ownership in Sprout. No ownership rights in Sprout were ever transferred to Sciara or CapFund.

93.     Sciara claims that he has ownership interest in Sprout despite interfering with Sprout's business. Even if Sciara's assertion were true, Sciara would then be in breach of the fiduciary duty he would owe to Sprout by diverting Sprout's clients to CapFund.

94.     Sprout seeks a judicial determination that Sciara and CapFund have no ownership interest in Sprout.

95.     A judicial declaration is necessary and proper at this time so that the parties may ascertain their respective rights, obligations, and duties with respect to Sprout, and in order to resolve the controversy among the parties.

## Count V

### Breach of Fiduciary Duty Against Brian Sciara

### (In the Alternative)

96.     Sprout incorporates the preceding paragraphs as if set forth here in full.

97.     In the alternative, if Sciara does have an ownership interest in Sprout, as he claims, Sciara breached his fiduciary duty to Sprout.

98.     As an owner or member of Sprout, Sciara owed a fiduciary duty of loyalty to Sprout.

99.     Sprout provides funding services to business and individuals.

100.    Sprout heavily relies on referral partners to direct funding clients to use Sprout's services.

101.    On or about August 31, 2018, Sprout terminated its association with Sciara

14

and its agreement to perform customer service and processing for CapFund's clients. Sprout ceased receiving any of CapFund's revenues shortly thereafter.

102. After August 31, 2018, Sciara started to solicit clients and referral partners to generate revenues for CapFund and Funded, LLC, even though he was allegedly an owner and/or member of Sprout.

103. Sciara breached his duty of loyalty to Sprout by directly competing against Sprout with CapFund and Funded, LLC for clients and referral partners.

104. In so doing, Sciara usurped corporate opportunities from Sprout by selling the funding services of CapFund and Funded, LLC to clients and encouraging referral partners to direct leads for funding opportunities to CapFund and Funded, LLC without first offering these opportunities to Sprout.

105. If Sciara is indeed an owner or member of Sprout, his actions in competing against Sprout for clients, referral partners, and leads through CapFund, Funded, LLC, or any other similar funding business or entity constituted a breach of the fiduciary duty of loyalty he owed to Sprout.

106. Sciara's breach of his fiduciary duty of loyalty to Sprout caused substantial monetary damages to Sprout in the form of lost profits, lost revenues, interference with existing business relationships, and interference with prospective business relationships.

107. Sciara's breach of his fiduciary duty of loyalty to Sprout caused damages to Sprout in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Sprout requests the following relief against Defendants:

1. Judgment in favor of Sprout on its claim for tortious interference with business relationships against all Defendants;

2. Judgment in favor of Sprout on its claim for civil fraud against the Sciaras and CapFund;

3. Judgment in favor of Sprout on its claim for fraud in the inducement against the Sciaras and CapFund;

15

4.      A judicial declaration that Sciara and CapFund have no ownership interest in Sprout;

5.      Compensatory and consequential damages on all claims allowed by law, in an amount to be determined at trial;

6.      Payment of Sprout's reasonable attorneys' fees and costs, court fees, and expert witness fees, pursuant to A.R.S. §§ 12-341, 12-341.01, and as otherwise allowed by law;

7.      Pre- and post-judgment interest on any award of damages to the extent allowed by law; and

8.      Such additional and further relief as this Court deems just and proper.


DATED this 6th day of August, 2019.

OSBORN MALEDON, P.A.

By _____
David B. Rosenbaum
Joseph N. Roth
Phillip W. Londen
2929 North Central Avenue, 21st Floor
Phoenix, Arizona  85012-2793

HOLLAND & HART LLP
Bryce K. Kunimoto
      (*pro hac vice to be submitted*)
Robert J. Cassity
      (*pro hac vice to be submitted*)
9555 Hillwood Drive, 2nd Floor
Las Vegas, Nevada  89134

Attorneys for Plaintiff Sprout Financial, LLC

8188094

16